UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

1     "How about working in the scrap yard?"

2     "I wouldn't trade that experience for the world."

3     "It's nepotism," the professor instigated.

4     "Was I good at my job?"

5

6     "Does it matter?" the professor asked.

7     Please find the following suggestions, for your review:

8     **(1)** Alter the Constitution as it pertains to race and gender and,

9     **(2)** Spend the next three years restructuring the Federal Budget[16] thereby reducing the *GDP to*

10         *debt %* to be in line with similar ratios of leading public companies and,

11

12     **(3)** Add an Amendment requiring the Executive Branch to pass upon to the next

13         administration a surplus of at least $1 and,

14     **(4)** Choose a personally important cause[17], convince EVERY congressperson of its

15         importance, rally the support of the nation's wealth, and carry out the cause and,

16     **(5)** Remove language relating to gender or race from the Equal Pay for Equal Work Act of

17         1963 [29 U.S.C.A. § 206 (d) (1)] thus enforcing the law as a "pay-for-performance" law

18

19         and,

20     **(6)** Sunset the Affordable Care Act due to debt (the Act maintains core financial issues which

21         are similar to my "solution" to homelessness – it doesn't address root cause) and,

22     **(7)** Ensure the right to marry by two consenting adults is protected by the Constitution (via

23         the Preamble's language regarding the "Blessings of Liberty to ourselves and our

24

25

26

27     ---

[16] http://www.standardandpoors.com/ratings/articles/en/us/?articleType=HTML&assetID=1245316529563

28     [17] As an example, rescue an oppressed group within another country without causing a single American life's end. Fight to alter gun control laws.

*Wright v. United States of America*, Case #            Page **43** of **46**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

Posterity[18]" coupled with U.S.C.A, U.S. Const., Amendment XIV, Section 1 "No State

shall make or enforce such law which shall abridge...the privileges of the United States."

Its flexibility is its brilliance).

## XI.    INDEX – UNITED STATES DEBT METRICS



Source: http://en.wikipedia.org/wiki/History_of_the_United_States_public_debt



Source: http://en.wikipedia.org/wiki/File:FederalDebt1940to2012.svg

---

[18] As per Keynes, English Dictionary, 1772, "a particular compassion bestowed by God; of freedom to us and to our children." Along with Section 1, XIV Amendment, it's unconstitutional to deny any adult the right to marry and have children, to have a family. Plaintiff would define 'us' as 'all adults.'

*Wright v. United States of America*, Case #                                    Page **44** of **46**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

## XII.   INDEX – EXHIBITS

| | |
|---|---|
| Exhibit 1 | E-mail threads requesting assistance from F.B.I. |
| Exhibit 2 | 08-CR-068, U.S. District Court, Cleveland, Ohio |
| Exhibit 3 | 04-CR-030, U.S. District Court, Cleveland, Ohio |
| Exhibit 4 | Letter to U.S. Attorney's Office, Cleveland, OH dated April 10th, 2011 |
| Exhibit 5 | Letter re: Bankruptcy Attorney to Bar Association; Chase Settlement; Engagement Letter with Bankruptcy Attorney |
| Exhibit 6 | Oath of California Attorneys, Business and Professions Code, Section H |
| Exhibit 7 | Letter to Breen Pugh, former criminal attorneys for Plaintiff's Jan. 2nd, 2007 incident in Stone Park, Illinois. |
| Exhibit 8 | Case # CGC-13-536085; Primary Complaint without exhibits. |
| Exhibit 9 | Application for Due Date Request re: Petition for Writ of Certiorari sent to United States Supreme Court. |
| Exhibit 10 | Denial letter from Clerk of the Supreme Court, dated same day as receipt. Supports claim for corruption, conspiracy as the Clerk could not have properly read and understood – *would have to be vetted by a Judge* for understanding. |
| Exhibits 11 | BroadVision ("BVSN") e-mails c. December, 2010 to/from BroadVision's General Counsel. |
| Exhibit 12 | BVSN exit interview documents. |
| Exhibit 13 | BVSN's Sears proposal. |
| Exhibit 14 | BVSN's Sears proposal. |
| Exhibit 15 | Fax from Neil Pisane of BVSN; indication that NJP Enterprises exists. |
| Exhibit 16 | Sears/CSC purchase order. |
| Exhibit 17 | Personal notes. |
| Exhibit 18 | Account assignments. |
| ~~Exhibit 19~~ | ~~BV Exit Interview Documents.~~   (EXHIBIT 12) |
| Exhibit 20 | BV potential compensation owed. |
| Exhibit 21 | Doug Chevrolet Performance Questions and Graphs. |
| Exhibit 22 | Letter to Chevrolet Sales Chief |
| Exhibit 23 | Marketing Ideas for General Motors |
| Exhibit 24 | Letter to Admiral - GM Board Member - On Behalf of Dad - 10.21.2013. Supports request for |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | help from the United States Navy's medical staff. Request assumes the psychiatrist has been properly vetted and is in honorable standing. |
|---|---|
| Exhibit 25 | Letter to McInerneys dated April, 2011 |

**E-mail from FBI, San Francisco dated December 16th, 2013. Denying Plaintiff's request.**



**E-mail to Plaintiff's father, cc:ing FBI, San Francisco dated Dec. 16th, 2013.**



Exhibit 1

Page **1** of **2**

**E-mails to FBI, San Francisco re: U.S. Marshal Service Concerns dated November 14th, 2013.**



Exhibit 1         Page **2** of **2**



UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Filed: |
| | ) | |
| v. | ) | **1 : 08CR0068** |
| | ) | Criminal No. |
| ALLIANCE NATIONAL LIMITED | ) | **MAG. JUDGE PERELMAN** |
| PARTNERSHIP, d/b/a | ) | |
| DEMILTA IRON & METAL, LTD; | ) | **JUDGE GAUGHAN** |
| | ) | |
| FRANCIS DEMILTA; and | ) | Violations: |
| | ) | 15 U.S.C. § 1 |
| RONALD VAUGHN | ) | 18 U.S.C. § 1623; and |
| | ) | 18 U.S.C. § 1503 |
| Defendants. | ) | |

## INDICTMENT

The Grand Jury charges:

## COUNT I

### CONSPIRACY TO RESTRAIN TRADE
### IN VIOLATION OF THE SHERMAN ANTITRUST ACT
### (15 U.S.C. § 1)

### THE DEFENDANTS

1.    The following companies and individuals are hereby indicted and made

Defendants in the charge stated below in Count One:

Ex. 2

(b)     whether RONALD VAUGHN ever met with Loren Margolis and Mark

Weingold, at the Holiday Inn or elsewhere, to discuss increasing the monthly busheling sales

from 150 tons to a higher tonnage level as part of the collusive agreement between DeMilta

Iron & Metal and co-conspirators not to solicit each other's scrap metal suppliers; and

(c)     whether RONALD VAUGHN, along with Francis DeMilta, ever met with Loren

Margolis and Mark Weingold at the Holiday Inn.

49.     At the aforesaid time and place, while under oath, RONALD VAUGHN

knowingly declared falsely before the Grand Jury with respect to material matters as follows:

(Page references are to the official Grand Jury transcript of RONALD VAUGHN dated

June 7, 2005. Declarations charged as false are underscored.)

************************

Q;      Do you recall meeting with Mark Weingold and Loren Margolis at the Holiday
        Inn on Wilson Mills Road?

A:      No.

Q:      Do you recall meeting with Loren Margolis and Mark Weingold at some other
        place?

A:      Again, the only time was at our yard to view material that was not consistent
        with what we were buying.

Q:      Did you ever meet with Loren Margolis and Mark Weingold and talk about the
        tonnage arrangement on bush[e]ling needing to be increased from 150 tons to a
        higher level?

A:      No. I mean, I constantly would ask, you know, you got more tonnage, you got
        more tonnage? It wasn't like a set meeting to say we need to go from here to
        here, no.

Q:      Do you recall Atlas Lederer Company?

A:      I know who the Atlas Lederer Company is.

-30-

Ex. 2

Q:   And they were bought by Jack Weingold, weren't they?

A:   Yes, they were.

Q:   And it was bought by Jack Weingold in April – approximately April of 1999. Do you remember that?

A:   I remember it was purchased, I don't remember the date.

Q:   Do you remember it being purchased by Jack Weingold?

A:   Yes, I do.

Q:   Afterwards, after it was purchased by Mr. Weingold do you recall meeting with Mark Weingold and/or Loren Margolis and discussing with them the need or the interest in having Weingold sell DeMilta Company increased tonnages of bush[e]ling?

A:   <u>No</u>.

Q:   Do you recall insisting that the 150 ton arrangement initially struck was no longer acceptable and that that volume tonnage needed to be increased to a higher level?

A:   <u>No</u>.

Q:   Do you remember telling Mark Weingold and/or Loren Margolis at any meeting at any time that you wanted 500 tons of bush[e]ling to be sold?

A:   <u>No</u>.

Q:   Do you remember ever meeting with Mark Weingold?

A:   Again, in the yard to view material that was not exactly what we were supposed to be getting.

\*       \*       \*

Q:   Do you recall any discussion with Loren Margolis or Mark Weingold after Jack Weingold purchased Atlas Lederer about purchasing scrap or increasing the purchase of scrap from the Weingold Company?

A:   <u>No</u>.

-31-

Ex. 2

[Vaughn Transcript, P. 147, Lines 23-25; P. 148, Lines 1-25; P. 149, Lines 1-25; and P. 150, Line 1-4.]

\* \* \*

Q: Now, we've talked a lot about a meeting at the Holiday Inn. I'm going to ask you about a meeting at the Holiday Inn b[ut] a different meeting. Did you ever meet with Mark Weingold, not Jack Weingold but Mark Weingold, Loren Margolis, Frank DeMilta and yourself at that same Holiday Inn off of Wilson Mills?

A: <u>No</u>.

Q: Never at all?

A: <u>Never at all</u>.

[Vaughn Transcript, P. 161, Lines 18-25; P. 162, Lines 1-2].

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

50.     The aforesaid declarations of RONALD VAUGHN, as he then and there knew, were false in that RONALD VAUGHN was, in fact, aware: (1) that RONALD VAUGHN had met with Loren Margolis and Mark Weingold at the Holiday Inn; and (2) that, at this meeting, which took place after Jack Weingold bought another local scrap metal company called Atlas Lederer, RONALD VAUGHN specifically requested that M. Weingold needed to increase its monthly busheling sales to DeMilta Iron & Metal or DeMilta Iron & Metal would begin to compete aggressively against M. Weingold and its affiliated companies.

## JURISDICTION AND VENUE

51.     The aforesaid false material declarations charged in Count VII of this Indictment were made by the Defendant RONALD VAUGHN before the Grand Jury sitting in the Northern District of Ohio within the five years preceding the return of this Indictment.

**ALL IN VIOLATION OF TITLE 18, UNITED STATES CODE, SECTION 1623.**

-32-

Ex. 2

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Filed:     January 15, 2004 |
| | ) | |
| v. | ) | |
| | ) | Criminal No. 1:04-CR-030 |
| M. WEINGOLD & CO.; | ) | |
| HARRY ROCK & ASSOCIATES, INC. | ) | |
| (FORMERLY KNOWN AS | ) | Judge:     John R. Adams |
| HARRY ROCK & COMPANY); | ) | |
| JACK WEINGOLD; and | ) | |
| LOREN MARGOLIS; | ) | Violations: 15 U.S.C. § 1; |
| | ) |           18 U.S.C. § 1343 |
| Defendants. | ) | |

## **INDICTMENT**

The Grand Jury charges:

### COUNT ONE:
### CONSPIRACY TO RESTRAIN TRADE
### IN VIOLATION OF THE SHERMAN ANTITRUST ACT
### (15 U.S.C. § 1)

### I
### DESCRIPTION OF THE OFFENSE

1.     The following corporations and individuals are hereby indicted and

made Defendants on the charge stated below in Count One:

Ex. 3

April 16th, 2011

U.S. Attorney's Office, Northern District of Ohio
2 S. Main St. - 208 Fed Bldg.
Akron, OH 44308
Phone: (330) 375-5716
Fax: (330) 375-5492
Re: **Summit County Case # - CV-2011-03-1255**

Dear Sir/Madam,

This letter is meant to alert your office of an incident that occurred on February 15th, 2011 which was initiated via a 911 call I made at approximately 4 AM EST. Although I am unsure what root cause of my symptoms were, I suspect I may have been drugged and, based on current life circumstances, am somewhat afraid someone or some group is trying to harm my life. I am concerned because since the Feb. 15th, 2011 incident, I have noticed cognitive changes. Therefore, I am contacting your office for investigatory follow-up.

I filed a suit in Summit County Court in order to create a record of the event for investigation into the matter. The situation has been detailed within Summit County Case #CV-2011-03-1255. I have moved the Court to Dismiss the case because I do not have resources nor the time to try the case nor do I want additional burden placed on an already strained economic system. But I am asking, via this letter, for this office to investigate the matter.

In trying to figure out who may be trying to harm me – if I am correct that the situation was caused by an external substance - I might recommend interviewing Motel 6 employees in Montrose, OH, some of whom may not hold Visas to legally work in the United States. This is merely a suspicion, but based on a few conversations with them, may be true.

Kind Regards,

*/s/ Jesse F. Swartz*
Jesse F. Swartz, V
773.255.6274 (cl)
jessef5@live.com

Cc: Steven M. Dettelbach, United States Attorney

United States Court House
801 West Superior Avenue; Suite 400
Cleveland, Ohio 44113-1852
Tel: (216) 622-3600

Ex. 4

## U.S. Bankruptcy Court
## Northern District of Illinois (Chicago)
## Adversary Proceeding #: 09-01145

*Assigned to:* A. Benjamin Goldgar                    *Date Filed:* 11/09/09
*Lead BK Case:* 09-27024
*Lead BK Title:* Jesse F. Swartz
*Lead BK Chapter:* 7
*Demand:* $20000

*Nature[s] of Suit:* 62 Dischargeability - 523(a)(2), false pretenses, false representation, actual fraud

**Plaintiff**
-----------------------

**Chase Bank USA, N.A.**                    represented by **Richard S Ralston**
                                            Weinstein & Riley PS
                                            2001 Western Avenue Suite 400
                                            Seattle, WA 98121
                                            206 269-3490
                                            Email: richardr@w-legal.com
                                            *LEAD ATTORNEY*

V.

**Defendant**
-----------------------

**Jesse F. Swartz, V.**                     represented by **Jesse F. Swartz, V.**
SSN / ITIN: xxx-xx-0925                                    PRO SE

| Filing Date | # | Docket Text |
|-------------|---|-------------|
| 11/09/2009 | 1 | Adversary case 09-01145. (62 (Dischargeability - 523(a)(2), false pretenses, false representation, actual fraud)): Complaint by Chase Bank USA, N.A. against Jesse F. Swartz V.. Fee Amount $250. Status hearing to be held on 1/13/2010 at 10:00 AM at 219 South Dearborn, Courtroom 613, Chicago, Illinois 60604. (Attachments: # 1 Corporate Ownership Statement) (Ralston, Richard) (Entered: 11/09/2009) |
| 11/09/2009 | 2 | Summons Link Summons Issued on Jesse F. Swartz V. Answer Due 12/9/2009 (Ralston, Richard) (Entered: 11/09/2009) |
| 11/09/2009 | 3 | Receipt of Complaint(09-01145) [cmp,cmp] ( 250.00) Filing Fee. Receipt number 12609706. Fee Amount $ 250.00 (U.S. Treasury) (Entered: 11/09/2009) |

Ex. S

| 11/13/2009 | 4 | Summons Service Executed on Jesse F. Swartz. (RE: 2 Summons Issued). (Ralston, Richard) (Entered: 11/13/2009) |
|---|---|---|
| 01/13/2010 | 5 | Hearing Continued (RE: 1 Complaint). Status hearing to be held on 2/17/2010 at 10:00 AM at 219 South Dearborn, Courtroom 613, Chicago, Illinois 60604. (Castellano, Nancy) (Entered: 01/13/2010) |
| 02/16/2010 | 6 | Notice of Motion and Motion for Default Judgment against Jesse F. Swartz and in favor of Chase Bank USA, N.A. in the amount of $20,045.00 Filed by Richard S Ralston on behalf of Chase Bank USA, N.A.. Hearing scheduled for 2/17/2010 at 10:00 AM at 219 South Dearborn, Courtroom 613, Chicago, Illinois 60604. (Attachments: # 1 Proposed Order # 2 Judgment) (Ralston, Richard) (Entered: 02/16/2010) |
| 02/16/2010 | 7 | Affidavit of Relief Sought Filed by Richard S Ralston on behalf of Chase Bank USA, N.A. (RE: 6 Motion for Default Judgment). (Ralston, Richard) (Entered: 02/16/2010) |
| 02/16/2010 | 8 | Affidavit of Nonmilitary Status Filed by Richard S Ralston on behalf of Chase Bank USA, N.A. (RE: 6 Motion for Default Judgment). (Ralston, Richard) (Entered: 02/16/2010) |
| 02/16/2010 | 9 | Affidavit of Complaintant Filed by Richard S Ralston on behalf of Chase Bank USA, N.A. (RE: 6 Motion for Default Judgment). (Ralston, Richard) (Entered: 02/16/2010) |
| 02/17/2010 | 10 | Hearing Continued (RE: 1 Complaint). Status hearing to be held on 3/10/2010 at 10:00 AM at 219 South Dearborn, Courtroom 613, Chicago, Illinois 60604. (Castellano, Nancy) (Entered: 02/17/2010) |
| 02/17/2010 | 11 | (E)Order Striking Motion For Default Judgment (Related Doc # 6). Signed on 02/17/2010. (Castellano, Nancy) (Entered: 02/17/2010) |
| 03/03/2010 | 12 | Stipulation of Nondischargeability and Payment Plan. Filed by Richard S Ralston on behalf of Chase Bank USA, N.A.. (Attachments: # 1 Proposed Order) (Ralston, Richard) (Entered: 03/03/2010) |

PACER Service Center

Ex 5

| Transaction Receipt | | | |
|---|---|---|---|
| 03/09/2010 11:56:19 | | | |
| PACER Login: | wm0244 | Client Code: | |
| Description: | Docket Report | Search Criteria: | 09-01145 Fil or Ent: filed From: 11/9/2008 To: 3/9/2010 Doc From: 0 Doc To: 99999999 Term: included Format: html |
| Billable Pages: | 1 | Cost: | 0.08 |

Ex-5

### UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS

In re:

Jesse F. Swartz,                                    Bankruptcy No. 09-27024
                                                    Chapter 7
Debtor.                                             Judge A. Benjamin Goldgar

Chase Bank USA, N.A.,                               ADV. NO. 09-01145

Plaintiff,

vs.

Jesse F. Swartz,

Defendant.

### STIPULATION OF NONDISCHARGEABILITY AND PAYMENT PLAN

Plaintiff, Chase Bank USA, N.A., by and through its attorney-of-record Richard S. Ralston, and

Defendant, Jesse F. Swartz, hereby stipulate as follows:

#### RECITALS

1. On or about 07/25/2009, Defendant filed for relief under Chapter 7 of the Bankruptcy Code.

2. On the date of filing of the petition in this case, Defendant was indebted to Plaintiff for the sum

   of $27,269.09 on account number XXXXXXXXXXXX2509.

3. Plaintiff has filed an Adversary Proceeding objecting to the discharge of the debt. The Parties

   desire to resolve this matter without further litigation upon the terms and conditions herein.

#### AGREEMENT

4. The Parties agree that the sum of **$7,000.00** owed by Defendant to Plaintiff shall not be

   discharged by order of this Court, and Plaintiff shall be granted judgment against Defendant in

   this amount.

Page 1 – STIPULATION OF NONDISCHARGEABILITY AND PAYMENT PLAN
XXXXXXXXXXXX2509



4156637.1

Ex. S

5. The non-discharged sum of **$7,000.00** shall be paid as follows: **the sum of $100.00 per month,**

   **each month for 70 months, commencing 08/15/2010.** The remaining payments shall be due on

   the same day of each month thereafter. While not in default, such principal shall not bear interest.

6. Payments are to be made to:

   **Accounts Receivable**
   **Attn: Chase Bank USA, N.A.**
   **WEINSTEIN & RILEY, P.S.**
   **P.O. Box 3978**
   **Seattle, WA 98124**
   **ALWAYS INCLUDE ACCOUNT NUMBER ON PAYMENTS**

   Plaintiff or its agents may send monthly bills and invoices as a courtesy reminder to Defendant.

7. In the event Defendant defaults in payments, Plaintiff shall be entitled to declare the sum of

   **$7,000.00**, plus any interest, immediately due and payable, together with Plaintiff's reasonable

   attorneys' fees and costs incurred.

8. Defendant acknowledges and stipulates that if Defendant fails to make any payment as agreed,

   the remaining **$7,000.00**, less any payments made, shall bear interest at twelve percent (12%) per

   annum until paid or otherwise satisfied. However, no interest will accrue so long as payments are

   kept current.

9. Plaintiff will refrain from pursuing its rights under this agreement so long as Defendant continues

   to make payment on a regular, timely basis. If Defendant defaults, however, Plaintiff shall have

   the right to pursue any legally available remedy, including (but not limited to) garnishment of

   wages or bank accounts, and the filing of liens, without further notice.

10. Defendant understands that Defendant is waiving Defendant's right to a trial and the right to a

    discharge of this debt should Defendant prevail at trial. Defendant has carefully considered this

    settlement with an attorney of Defendant's choice, or has voluntarily elected not to do so, after

    being given that opportunity.



41566371



11. The parties each agree to pay their own attorney fees and costs in this matter.

_____
Attorney for Plaintiff,
Richard S. Ralston, Bar #6290524
Weinstein & Riley, P.S.
2001 Western Avenue, Suite 400
Seattle, WA  98121

$\dfrac{3/2/10}{\text{Date}}$

_____
Jesse F. Swartz
Defendant

$\dfrac{2/26/10}{\text{Date}}$

Page 3 - STIPULATION OF NONDISCHARGEABILITY AND PAYMENT PLAN
XXXXXXXXXXXX260·

41566371



Ex. 5

February 8th, 2010

The Chicago Bar Association
321 S. Plymouth Court
Chicago, IL 60604

Phone: 312-554-2000
Fax: 312-554-2054
Email: info@chicagobar.org
**Re: Bankruptcy case #09-27024**

Dear Sir/Madam,

I am writing as a former client of Jeff Whitehead, a bankruptcy attorney in the City of Chicago, State of Illinois. Please let this letter serve as a request for disciplinary action for the following reasons:

1.  Mr. Whitehead asked me, before the meeting of creditors, to lie about where I was living.
2.  Mr. Whitehead did not inform me that the cancellation of debt during a Chapter 7 filing would require tax payments on that debt (as I have no income, it is impossible for me to make these payments).
3.  Before the meeting of creditors, Mr. Whitehead did not inform me that the trustee would be putting me under oath and asking me what the legal issues behind my complaints were. He stayed silent during this taped interview.
4.  The dollar value of complaints against former employers, specified in Schedule B, especially the one against BroadVision, far exceeds the amount owed to creditors. It is my opinion that a Chapter 7 filing was not only an inappropriate route of remedy to relieve debt, but in direct conflict with my best interest.

Finally, one of the complaints filed in bankruptcy case #09-27024 was against a former employer, Ariba Technologies, Inc. I supplied background information to Mr. Whitehead, but that information has been ignored as a contributing factor to date. It is possible that Mr. Whitehead has an indirect relationship with former managers and/or employers at Ariba.

Please respond with appropriate next steps.

Sincerely,


Jesse F. Swartz, V
jessef5@live.com

2/8/10 – Sent via e-mail and snail mail on 2.8.10 c/o disciplinary committee.

Ex. 5

Law Office of Jeff A. Whitehead
205 West Monroe Street, Suite 401
Chicago, IL 60606
312.648.0473
312.276.8759 (fax)
Jeffwhitehead_2000@yahoo.com

Jeff Whitehead*#%

*Admitted in Illinois
#Admitted in Ohio
%Admitted in Pennsylvania

June 25, 2009

Jesse Swartz
1502 North Sedgwick Avenue, Apt 4S
Chicago, IL 60610

Re: Chapter 7 Bankruptcy

Dear Mr. Swartz:

I appreciate the opportunity to help you resolve your financial situation. After reviewing your finances, I agree with you that filing for bankruptcy under Chapter 7 is the best solution.

This letter will serve as an engagement agreement that will establish the terms of our relationship. When you sign it, it will become a contract between us.

In passing the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, the Congress imposed strict requirements upon attorneys representing debtors, requiring them to specify what duties they will perform and to make certain representations to clients. Those specific duties and representations are set out in the representation agreement.

Please read this agreement carefully and be sure you understand it. If you have any questions, you should consult with me before signing. Once you are satisfied with the agreement, please sign and return a copy to me.

Following are the specifics of our proposed representation. I will:

1.    Meet with you to discuss your financial situation and possible solutions;

2.    Provide the section 342(b)(1) notice, which sets out the purpose, benefits, and costs of filing under Chapters 7, 11, 12 or 13; the types of services available from credit counseling agencies; and the penalties of committing certain bankruptcy crimes, and will explain the notice to you;

3.    Prepare the necessary bankruptcy petition, schedules, statement of affairs, and other documents, and review and file the bankruptcy case under the chapter you select;

4.    Prepare for and accompany you to the section 341 first meeting of creditors;

5.    Assist in the amendments to the papers filed and the production of such documents as the trustee requests;

6.    Assist you in the negotiation and execution of reaffirmation agreements that are in your best interest and meet all requirements of the law.



For this work, we will charge a flat fee of $1701.00

In addition, you agree to reimburse us for the filing fees and other costs that the court allows or, if no court order is required, that are incurred on your behalf. The current filing fee for a Chapter 7 bankruptcy is $299.00.

The retainer fee and filing costs must be paid prior to the filing of your case with the court.

Any other services, such as defense of a complaint to determine dischargeability of a debt or of a United States Trustee motion to convert this case or dismiss it as an abusive filing, are not included and will be provided only through a separate representation agreement.

You agree to furnish all information necessary to enable us to complete the papers that will be filed in your case and that such information will be complete, accurate, and truthful.

If you fail to provide the full amount of the retainer as set out herein, we may be relieved from the responsibility of performing any further work under this representation agreement.

We may also be relieved of the responsibility to represent you if you fail to provide us information or documents in time and with sufficient adequacy to enable us to respond to any inquiry, or if you do not appear at any court hearing. If these failings occur after we have filed your bankruptcy case, we can only be relieved if the court allows our withdrawal. You will receive notice of any motion and hearing on our desire to withdraw.

This document represents the complete agreement between the parties and may not be modified or replaced except by a subsequent written agreement executed by the parties.

I have enclosed disclosures required by the Bankruptcy Code and a questionnaire. Please sign these disclosures, complete the questionnaire and return them to me as soon as possible.

Sincerely and agreed:

_____
Jeff Whitehead
A Debt Relief Agent

Date: _____

Accepted this _____ day of _____, 2009.

_____
Jesse Swartz

Ex. 5

## Business and Professions Code Section 6068
## Duties of Attorney

It is the duty of an attorney to do all of the following:

(a) To support the Constitution and laws of the United States and of this state.

(b) To maintain the respect due to the courts of justice and judicial officers.

(c) To counsel or maintain those actions, proceedings, or defenses only as appear to him or her legal or just, except the defense of a person charged with a public offense.

(d) To employ, for the purpose of maintaining the causes confided to him or her those means only as are consistent with truth, and never to seek to mislead the judge or any judicial officer by an artifice or false statement of fact or law.

(e) (1) To maintain inviolate the confidence, and at every peril to himself or herself to preserve the secrets, of his or her client.

(2) Notwithstanding paragraph (1), an attorney may, but is not required to, reveal confidential information relating to the representation of a client to the extent that the attorney reasonably believes the disclosure is necessary to prevent a criminal act that the attorney reasonably believes is likely to result in death of, or substantial bodily harm to, an individual.

(f) To advance no fact prejudicial to the honor or reputation of a party or witness, unless required by the justice of the cause with which he or she is charged.

(g) Not to encourage either the commencement or the continuance of an action or proceeding from any corrupt motive of passion or interest.

(h) Never to reject, for any consideration personal to himself or herself, the cause of the defenseless or the oppressed.

(i) To cooperate and participate in any disciplinary investigation or other regulatory or disciplinary proceeding pending against himself or herself. However, this subdivision shall not be construed to deprive an attorney of any privilege guaranteed by the Fifth Amendment to the Constitution of the United States, or any other constitutional or statutory privileges. This subdivision shall not be construed to require an attorney to cooperate with a request that requires him or her to waive any constitutional or statutory privilege or to comply with a request for information or other matters within an unreasonable period of time in light of the time constraints of the attorney's practice. Any exercise by an attorney of any constitutional or statutory privilege shall not be used against the attorney in a regulatory or disciplinary proceeding against him or her.

(j) To comply with the requirements of Section 6002.1.

(k) To comply with all conditions attached to any disciplinary probation, including a probation imposed with the concurrence of the attorney.

(l) To keep all agreements made in lieu of disciplinary prosecution with the agency charged with attorney discipline.

(m) To respond promptly to reasonable status inquiries of clients and to keep clients reasonably informed of significant developments in matters with regard to which the attorney has agreed to provide legal services.

(n) To provide copies to the client of certain documents under time limits and as prescribed in a rule of professional conduct which the board shall adopt.

(o) To report to the agency charged with attorney discipline, in writing, within 30 days of the time the attorney has knowledge of any of the following:

(1) The filing of three or more lawsuits in a 12-month period against the attorney for malpractice or other wrongful conduct committed in a professional capacity.

(2) The entry of judgment against the attorney in any civil action for fraud, misrepresentation, breach of fiduciary duty, or gross negligence committed in a professional capacity.

(3) The imposition of any judicial sanctions against the attorney, except for sanctions for failure to make discovery or monetary sanctions of less than one thousand dollars ($1,000).

(4) The bringing of an indictment or information charging a felony against the attorney.

(5) The conviction of the attorney, including any verdict of guilty, or plea of guilty or no contest, of any felony, or any misdemeanor committed in the course of the practice of law, or in any manner in which a client of the attorney was the victim, or a necessary element of which, as determined by the statutory or common law definition of the misdemeanor, involves improper conduct of an attorney, including dishonesty or other moral turpitude, or an attempt or a conspiracy or solicitation of another to commit a felony or any misdemeanor of that type.

(6) The imposition of discipline against the attorney by any professional or occupational disciplinary agency or licensing board, whether in California or elsewhere.

(7) Reversal of judgment in a proceeding based in whole or in part upon misconduct, grossly incompetent representation, or willful misrepresentation by an attorney.

(8) As used in this subdivision, "against the attorney" includes claims and proceedings against any firm of attorneys for the practice of law in which the attorney was a partner at the time of the conduct complained of and any law corporation in which the attorney was a shareholder at the time of the conduct complained of unless the matter has to the attorney's knowledge already been reported by the law firm or corporation.

(9) The State Bar may develop a prescribed form for the making of reports required by this section, usage of which it may require by rule or regulation.

(10) This subdivision is only intended to provide that the failure to report as required herein may serve as a basis of discipline. (Origin: Code Civ. Proc., §282. Amended by Stats. 1985, ch. 453; Stats. 1986, ch. 475; Stats. 1988, ch. 1159; Stats. 1990, ch. 1639, Stats. 1999, ch. 221; Stats. 1999, ch. 342; Stats. 2001, ch. 24; Stats. 2003, ch. 765, operative July 1, 2004.)

## Attorney's Oath

I solemnly swear (or affirm) that I will support the Constitution of the United States and the Constitution of the State of California, and that I will faithfully discharge the duties of an attorney and counselor at law to the best of my knowledge and ability.

Ex. 6

April 16th, 2011

Breen Pugh & Assoc
53 W. Jackson Boulevard, Suite 1460
Chicago, IL 60604
**Re: Expungement or Sealing – January 2nd, 2007 Event**

Dear Mr. Breen,

This letter is meant as a request for your office to assist me in the expungement or sealing
(whichever prevents others from viewing more stringently) of the events from January 2nd, 2007,
where your office defended me in criminal charges re: a fight that occurred.

I also wanted to follow-up as it pertains to a lawsuit where I named your office as defendants.
There is much about that evening that seemed odd to me – from the butt-kicking I took
(apparently at the hands of officers), to the officer's testimony, to the $50,000 bond that was set
and the 8th Amendment's vagueness, and to Miranda that makes the incident feel, in hindsight,
like law school. In fact, it seems that I may have had a case against those who beat me up, not
the other way around. Why? I had no injuries on my hands and I had no scratches or injuries to
the back of my head, yet the officer said I head butted him with the back of my head.

So I wanted to inform your office and Stone Park, via the suit, that I recalled the event, had a few
outstanding questions, didn't think I actually deserved to be arrested with the felony charges, but
wanted to see the tape to see just how bad that night really was. My suit was not intended to be
tried nor won, save a request to see the tape of the event.

One statement that irks me – Todd told me, re: the tape, "the law was broken." But he never said
who broke it. No matter what really happened, I would have been able to diffuse the situation
had I not been drunk to such an extent and probably deserved a punch or two, so no further
ranting and raving on my part is needed. Just want the event off my record - *please*.

Therefore, would your office please expunge or seal the matter for me? Life has been very
difficult since – I have been without steady W-2 employment for more than 3 years leaving me
unable to pay you for the expungement. Hopefully the $5K paid to your office 4 years ago will
cover the effort.

Please send word to my attention: Haven of Rest, 175 E Market St., Akron, OH, 44309.

My best to your office.

Regards,

Jesse F. Swartz, V
773.255.6274 (cl), jessef5@live.com



1 of 1

1  Franklin H. Wright
   (alias for Jesse F. Swartz, Jr.)
2  1001 Polk St., Bed #68
   San Francisco, CA 94109
3  frank.wright9@gmail.com

4
                    **SUPERIOR COURT OF CALIFORNIA**
5                     **COUNTY OF SAN *FRANCISCO***

6
7  Franklin H. Wright                    )        Case No.
                                         )
8  v.                                    )
                                         )
9  Marriott International, Inc.          )
   c/o Edward A. Ryan, General Counsel   )
10 10400 Fernwood Rd.                    )
   Bethesda, MD 20817                    )
11 Ph: 301.380.3000                      )        **COMPLAINT FOR DAMAGES**
                                         )
12 Host Hotels & Resorts, Inc.           )        (Breach of Implied Contract, Assault
   c/o Elizabeth A. Abdoo, General Counsel )      & Battery, Breach of Fiduciary Duty,
13 6903 Rockledge Drive, Suite 1500      )        Harassment, others as stated within)
   Bethesda, MD 20817                    )
14 Ph: (240) 744-1000                    )        **UNLIMITED CIVIL CASE**
                                         )        Amount demanded exceeds $25,000
15 San Francisco General Hospital        )
   c/o General Counsel                   )
16 1001 Portrero Ave.                    )
   San Francisco, CA 94110               )
17                                       )
   City and County of San Francisco      )
18 c/o Mr. George Gascon, District Attorney )
   850 Bryant St.                        )
19 San Francisco, CA 94103               )
   DistrictAttorney@sfgov.org            )
20 Ph: 415.553.1129                      )
                                         )
21 City and County of San Francisco      )
   Office of the Public Defender         )
22 555 7th Street                        )
   San Francisco, CA 94103               )
23 daniel.meyer@sfgov.org                )
   Ph: 415.553.9330                      )
24                                       )
   San Francisco Police Dept.            )
25 c/o Mr. Greg Suhr, Chief of Police    )
   850 Bryant St., #525                  )
26 San Francisco, CA 94103               )
   Ph: 415.553.1373                      )
27 sfpdcommunityrelations@sfgov.org      )

28

Complaint, *Wright v. Marriott International, Inc., et al*          Page **1** of **25**

Ex. 8

**COMPLAINT**

Section VI herein discusses Venue, Jurisdiction and Statute of Limitations.

## I. CAUSE(S) OF ACTION

(1)     On or about September 28th, 2013, the company who employs management and staff at the Marriott Marquis in San Francisco, CA did commit a breach of implied contract (*Cal. Civ. Code § 1621*), "one, the existence and terms of which are manifested by conduct."

(2)     Plaintiff contends assault[1] and battery[2] was committed by the company[3] who employs the security guards at the Marriott Marquis, San Francisco, California. Plaintiff asserts his claims against the employer of these security officers is actually several counts of the assault and battery claim – one for each punch – approximately 8 counts.

(3)     Plaintiff asserts a claim of slander (*Cal. Civ. Code § 46*) against the Marriott Security officers.

(4)     Plaintiff asserts a claim for harassment (*Cal. Civ. Code § 1708*) against the company who employs the Security Officers.

(5)     Plaintiff also asserts the officer detailed in the Statement of Facts section who fondled his genitals 4 times did commit 4 separate counts of sexual harassment (*Cal. Civ. Code § 51.9*); the officers also committed one count of duress and one count of breach of fiduciary duty.

(6)     Plaintiff asserts a breach of fiduciary duty claim and a claim of harassment (*Cal. Civ. Code § 1708[4]*) against San Francisco General Hospital ("SFGH").

---

[1] "A civil action for assault is based upon an invasion of the right of a person to live without being put in fear of personal harm." *Lowry v. Standard Oil Co.* (1944) 63 Cal.App.2d 1, 7 [4]

[2] Pen C § 242, battery defined. As per California Tort Damages, SECOND EDITION, §7.3 "offensive physical conduct" that was intentional and unlawful.

[3] Marriott International, Inc.; Host Hotels; or other to be identified via Discovery.

[4] Plaintiff could not locate a Civil Code for Harassment, but the Code's Index suggests *Cal. Civ. Code § 1708* is "in the same family." The Code states: "Every person is bound, without contract, to abstain from injuring the person…, or infringing upon any of his or her rights."

Ex. 8

1    (7)    Plaintiff asserts a claim of duress (*Cal. Civ. Code § 1569)* by San Francisco General

2 Hospital's Psychiatric Dept. Plaintiff also asserts a claim for one count of libel (*Cal. Civ. Code § 45*)

3 against San Francisco General Hospital's Dept. of Psychiatry's John D. Rouse (Ex. B).

4    (8)    Plaintiff submits a claim for breach of fiduciary duty[5] against Ms. Masi and the public

5

6 defender's office, Count 1. Plaintiff makes another claim of breach of fiduciary duty against Mr.

7 Daniel Meyer and the public defender's office, Count 2. (*see* Exhibit D).

8    (9)    Plaintiff asserts a claim for harassment against the Office of the District Attorney,

9 Investigations Office of San Francisco, California (*Cal. Civ. Code § 1708)*. (*see* Exhibit C, D)

10   (10)   Plaintiff asserts probable cause for additional defamation (*Cal. Civ. Code § 45, § 46*)

11

12 counts exists and may be uncovered via subpoena and discovery of Hospital and Police records, if the

13 case is permitted to move to the Discovery stage.

14   (11)   Finally, Plaintiff asserts a violation of the State of California's Constitution (*Article I,*

15 *§ 1 "Inalienable Rights", California Constitution*) against Marriott International, Inc., Host Hotels,

16 the San Francisco Police Dept., SFGH, and the City of San Francisco. The Statement of Facts

17

18 (Section II) should suffice in supporting Plaintiff's claim that his "inalienable rights" to enjoy and

19 pursue...happiness and privacy (paraphrased) were impeded by Defendants' aggregate actions from

20 Sept. 28th, 2013 through Oct. 10th, 2013. Plaintiff reserves the right to add additional claims upon

21 which relief can be sought via the Discovery process.

22   (12)   Plaintiff reserves the right to add or modify claims and their corresponding statutes

23

24 post-Discovery (e.g. – add negligence, fraud; harassment changed to one count assault, one count

25 battery, five counts breach of fiduciary by witnesses).

26   **II. STATEMENT OF FACTS**

27 ---
[5] *Pierce v. Lyman*, 1 Cal. App. 4th 1093, 1101 (1991) discusses breach of fiduciary claims in California whereby Plaintiff
28 must allege the existence of a fiduciary relationship, its breach, and the damage caused by the breach (i.e. – attorney/client
privilege, an unwelcomed presence at a meeting, and damage caused by information given to a Judge or a Doctor).

Complaint, *Wright v. Marriott International, Inc., et al*                                          Page **3** of **25**

Ex. 8

On or about September 28th, 2013 at approx. 12.15 AM PST, Plaintiff arrived at the Marriott Marquis in San Francisco, CA. He briefly spoke to Byron Gonzalez, the Guest Relations Manager on Duty. He informed Mr. Gonzalez of his financial situation – he was destitute and living on the streets. He also briefed Mr. Gonzalez re: Plaintiff's background as a Marriott Rewards Elite member and loyal customer. He informed Mr. Gonzalez that he did a bit of independent work for the current CEO of Marriott via a case study of sorts. Plaintiff asked if he could trade his remaining Marriott points for a cup of coffee and an unspecified amount of time in the lounge to write and relax. After a bit of discussion, Mr. Gonzalez agreed to allow Plaintiff a time to sit and relax and write in his journal but did not accept Plaintiff's Marriott Rewards points in trade.

Plaintiff took a seat opposite the bar in the lounge area where no one besides a bartender – who was cleaning and shutting down the area - was present. Plaintiff began to write at 12.37 AM PST (see Exhibit C). At some point, Plaintiff left to walk around the lower level (he often walks around hotels as the experience sometimes helps him in a business plan he works on from time to time). He noticed a convention had taken place and inspected the bathrooms. He flushed several of the toilets as they had urine in them. He washed his hands afterwards. A few employees were the only ones around; they were cleaning. Plaintiff returned to his seat in the lounge.

At some point Plaintiff walked to and from the front desk to ask for a few favors – a newspaper and a cup of coffee given by a staff member who had vocal skills (impersonations of some kind). At one point Plaintiff asked if the shuttle driver would take him to the Marin County side of the Golden Gate Bridge to watch the sunrise, if the driver was not busy. The ride to Golden Gate was denied.

At about 1 AM PST a security guard approached and told him he had to leave. Plaintiff asked why and the security guard simply told him someone had complained and that I had "caused

Ex. 8

concern." (paraphrased) Plaintiff instructed the security guard that Mr. Gonzalez, the manager, had agreed to allow Plaintiff time to write and relax. At some point, three additional security guards - three appeared to be of Asian ethnicity, one of Hispanic or Latino heritage and much larger – arrived and stood in front of Plaintiff. Plaintiff told the security officers he would leave if and only if Mr. Gonzalez appeared and instructed him to do so.

The Security Guards insisted Plaintiff had to leave or he would be cuffed and the police contacted. Plaintiff insisted he was accurate and instructed them "not to touch him." At some point, Plaintiff slowly started putting his computer in his bag – an indication he would leave but was doing so against his will and against the agreement with the Manager on Duty. Plaintiff was displeased by the instruction of the security team as well as the manner in which the message was being delivered.

A few of the Security Guards began putting on gloves indicating to Plaintiff that they were about to utilize force to restrain Plaintiff. They stepped toward him. Plaintiff remained seated and said "don't touch me." The Security team restated that Plaintiff had to leave. Finally, the security officer to Plaintiff's left – the furthest left of the four team members from Plaintiff's view – lunged at Plaintiff as Plaintiff was seated. Plaintiff, in response to the physical threat, tried to grab and hold the largest security officer's right hand.

Plaintiff was thrown down on the ground immediately – he was lying on his stomach facing the bench where he had previously sat. He was then hit in the face, head, and ribs several times – mostly to the left side of his body. He pleaded "All right!" and asked them to stop. He was cuffed – the largest man who appeared to be Latino was breathing heavily.

The security officers then stood Plaintiff on his feet and escorted him out of the lounge and to an elevator that appeared to be a freight elevator. Plaintiff repeated "Jesus Christ!" in exclamation of the surprise he felt and to what he had at first thought was an 'unreal' situation; a test of some sort.

$Ex. 8$

In the elevator, Plaintiff was concerned he would be beaten further. Plaintiff was taken to an area that seemed to be the Security Officer area on the ground level. The police were contacted while Plaintiff sat in a chair in the hallway outside a glass-enclosed area and the largest man stood to Plaintiff's right. At some point, the largest man took two close-up pictures of Plaintiff with his camera phone. Plaintiff felt as if (and later confirmed) his lip was split open and bleeding.

Plaintiff also then recalled one particular point about a similar incident years ago in a suburb outside of Chicago – an incident where he recalls very few details. He had been arrested by an officer and was in a verbal argument about two college institutions while being taken to a holding cell. The officer he recalled from Stone Park, IL seemed to be an Auburn fan; perhaps a wrestler there. So, upon his recollection, Plaintiff said "Auburn" and sighed.

At one point, Plaintiff said "it didn't feel good then, but it does feel good now" suggesting that the physical altercation was a manifestation of how he had been feeling over the past several years – beaten down by the system. He also attempted to find out more about his assailant's personality and asked him if he had children. The man replied he had a son, maybe 4 years old. Plaintiff asked him about children because he was concerned about the man's physical size and apparent desire to fight (i.e. – his taking pictures of Plaintiff indicated he would share them with friends and brag of his "trophy"). He was concerned the man was an abusive man. Plaintiff then said something to the effect of "you need to be careful." The man responded "You threatening my kid!?!" (paraphrased). Plaintiff asserts he was not threatening anyone; he was merely identifying a possibly abusive man's risk areas.

The police arrived and spoke to the security officers. He overheard the largest security officer state that Plaintiff had threatened his children. One of the officers – apparently of Asian descent – asked Plaintiff what happened. Plaintiff briefly told the officer that he was assaulted by the Security

Ex. 8

1  Team who was now accusing Plaintiff. Plaintiff also told the police officer that he "needed a

2  moment" and began to tear up. Plaintiff had suddenly felt as if all the work he had done in the years

3  between the altercation in the suburb of Chicago and the assault and battery by Marriott's security

4  group had been erased. It was happening all over – despite his cessation efforts, despite his exercise

5
6  and diet work, despite independent entrepreneurship activity (relating to and sometimes on behalf of

7  Marriott's leadership team), despite request for help from friends and family, despite attempts in the

8  Courts, and despite his desire to seek and find some sense of peace and quiet among what he

9  considered to be friends (Marriott, Incorporated).

10  He simply could not believe it was happening again.

11
12  The Police then cuffed Plaintiff, lifted him up, and frisked him. Plaintiff felt as if the way in

13  which the officer – apparently of Asian descent – frisked him was inappropriate. The officer fondled

14  Plaintiff's genitals. Plaintiff asked him not to do it again. The officer repeated this "inappropriate

15  fondling" approximately 4 times and did so with what can only be described as a "sly grin" on his

16  face, almost as if he was enjoying the process.

17
18  The officer told Plaintiff he was being taken to the Hospital into the Psychiatric Ward and was

19  to be placed on a 72-hr hold or "5150." While Plaintiff was escorted via police car to San Francisco

20  General Hospital, he insisted that he had done nothing wrong. He also asserted the officers had two

21  choices, either charge Plaintiff with some crime or release him. Plaintiff arrived at SFGH and was

22  told to wait – he sat in a chair. While waiting, he reasserted that the officers and the hospital had to

23  either release him or charge him with a crime. Plaintiff was not charged, to his knowledge.

24
25  Plaintiff was then told by the hospital staff that he needed a shot. Plaintiff refused.

26  Approximately 6 men and women surrounded Plaintiff and forced him into an isolation room. An

27  overweight woman asked him, while she stood behind him "What is your greatest fear?" Plaintiff

28

Complaint, *Wright v. Marriott International, Inc., et al*                     Page **7** of **25**

$Ex. 8$

1  responded, "That I'll be beaten in here." They strapped him to a bed, his right hand above his head,

2  his left below his waist – a *Staying Alive* dance position. He was restrained and given a shot of

3  something. He insisted he did not need nor want the shot. A large Caucasian woman – the same, he

4
5  believes, that scared him with her question re: his biggest fear - told Plaintiff what the shot was, but

6  he does not recall its contents.

7  Plaintiff was released from the room approximately 10 minutes later and given a bed, much

8  like the shelter beds where he now resides. Plaintiff stayed and then was moved to another floor

9  with approximately three other men in the room.

10  Plaintiff insisted on several occasions that he did not need to be at the Hospital. He
11
12  eventually met with a psychiatrist for a brief period of time. Plaintiff wrote but did not send a letter

13  to the Hospital (Exhibit A). Plaintiff refused medication that was prescribed yet, he felt, unneeded.

14  Plaintiff asked for a diagnosis and quizzed the staff on symptoms – the staff did not provide a link

15  between symptoms and a diagnosis. Plaintiff caught a cold and asked for congestion medication –

16  no cold medicine was given to Plaintiff. Plaintiff requested to see an MD to look at his ribs. His
17
18  request was denied.

19  Eventually Plaintiff was given a hearing with a magistrate Judge and was given representation

20  from two individuals from the Public Defender's Office, Karen A. Masi and Daniel G. Meyer.

21  Plaintiff did not feel comfortable with Ms. Masi, so he asked her to leave, in essence firing her.

22  Plaintiff then met with Mr. Meyer alone and they discussed the situation. Mr. Meyer basically told

23
24  Plaintiff if he wanted out of the Ward he had to allow the Judge to deem Plaintiff mentally unfit.

25  Plaintiff was not happy with Mr. Meyer and told him if he needed to get mad at the Judge then he

26  should do exactly that – get mad at him (i.e. – insist).

27  Before his hearing, Plaintiff noticed that Ms. Masi spoke to the Judge before his hearing but

28

$Ex. \partial$

1   after Plaintiff had told Ms. Masi that he did not want her to represent Plaintiff.   In essence Plaintiff

2   fired Ms. Masi.  (Exhibit D)

3        Plaintiff then had his hearing with the Judge, the doctor, Plaintiff and Mr. Meyer.  Plaintiff

4   was asked by the Judge to speak and Plaintiff informed him of his business plan re: REIT/homeless

5
6   solution/ecological idea and how he thought it was a sound business plan.  Plaintiff also was asked

7   about the Golden Gate bridge request – when he had asked the hotel staff if he could have a ride to

8   the Marin County side of the Golden Gate Bridge.  Apparently the hotel staff thought this was an

9   indication of a potential suicide attempt.  Plaintiff asserted a difference existed between inference and

10  implication, to which the magistrate judge seemed to concur.  Plaintiff simply explained he wanted to

11
12  see the sunrise – he enjoys sunrises and ones in San Francisco in particular.   Plaintiff's affinity for

13  sunrises has been detailed in a case against Stanford University (CV-13-4457 EMC, US District

14  Court, Northern California).

15       A discussion also ensued as to how he left Akron, Ohio.  Plaintiff did not give his permission

16  to have the Hospital, attorneys, or the Judge contact Plaintiff's family – to his recollection - but

17
18  apparently this was done anyway.  Plaintiff had informed his family and a previous employer that he

19  had "died" - a euphemism attached to an impending name change that signifies his physical location

20  change to California and hopeful new or reclaimed life.  Plaintiff was here to seek help from

21  attorneys and law firms relating to legal claims he had made in the Courts over the last 4 years in

22  Chicago, IL and Akron, Ohio.  The case in US District Court of Northern California describes some

23
24  of these complaints.  Some of Plaintiff's lawsuits named Plaintiff's family – the same ones that the

25  Hospital contacted.  Plaintiff's claims and anecdotes are accurate and unresolved.

26       The judge then spoke briefly to the doctor and deemed Plaintiff "fluidly psychotic."  The

27

28

Complaint, *Wright v. Marriott International, Inc., et al*                     Page **9** of **25**

Ex. 8

1  Judge then instructed Plaintiff that he "was outta here" – Plaintiff concurred and quickly left the

2  room. Plaintiff left the hospital about one hour later.

3      On or about October 1st, 2013, Plaintiff returned to the Marriott Marquis and spoke with

4  Byron Gonzalez. Mr. Gonzalez informed Plaintiff that he was unaware of the events and had not

5  instructed the Security Officers to ask Plaintiff to depart the property.

6

7      On October 3rd, 2013, Plaintiff sent an e-mail indicating the events that occurred to the

8  District Attorney's office, the FBI, the CEO and SVP, Human Resources at Marriott International,

9  Inc. and the Clerk of the Court (United States District Court of Northern California).

10      On or about October 8th, 2013, Plaintiff visited the Office of the District Attorney. He met

11  with Bobby Guzman, informed Mr. Guzman of the assault at the Marriott Marquis, and asked him to

12  investigate both the officers as well as the Marriott Security Guards. Mr. Guzman informed Plaintiff

13

14  that his office would not investigate.

15      On October 10th, 2013, Plaintiff visited the District Attorney's investigative office again. A

16  member of the DA's investigative team stared at Plaintiff through glass windows of the offices at 850

17  Bryant and was with at least two other officers. The man was armed with a holstered pistol. Plaintiff

18  stated to the man: "That is a VERY strong statement you're making." In short, Plaintiff asserts the

19

20  man was threatening and intimidating Plaintiff – the claim for harassment is made herein.

21      Plaintiff shared a draft, sent to defendants via e-mail on or about Dec. 1st, 2013, of this

22  Complaint.

23      Plaintiff was furious and threatened to sue the District Attorney on behalf of the United States

24  Attorney's office for Breach of Contract; he made this allegation via e-mail directly to Mr. Guzman.

25

26  Plaintiff then met with a clerk in the US Attorney's office several days later to discuss a "hypothetical

27

28

Complaint, *Wright v. Marriott International, Inc., et al*                    Page **10** of **25**

Ex. 8

situation whereby Plaintiff would sue on behalf of the US Attorney's office." He was told by the Clerk that he would not be able to perform such a task.

### III. STATUTE AND CASE LAW IN SUPPORT OF CLAIMS

Plaintiff contends an implied contract existed between Marriott's Guest Relations Manager – Mr. Gonzalez – and Plaintiff whereby Mr. Gonzalez agreed to the terms of Plaintiff's request for a place to sit, relax, and write for awhile. In support, "Words which would be understood by a reasonable person as imparting a promise may establish a contract despite the subjective intent of the party using them." *Findleton v. Taylor* (1962), 208 Cal. App. 2d 651, 652. Further, the verbally implied contract was restated several times whereby the Marriott staff graciously offered Plaintiff coffee and a newspaper. Perhaps Plaintiff pushed the situation a bit with a request for a ride across the bridge – a sunrise cruise if you will. But then again, Plaintiff has spent a dollar or two at the brand's properties.

The breach occurred when he was asked to leave – apparently without the knowledge of Mr. Gonzalez (Section II, pg. 10). Opposition to the suggestion that a verbal or implied contract existed might simply say that nothing was written or etched in stone. But if one interpretation is "reasonable and fair" and the other "unreasonable and unfair," the reasonable interpretation "...is accepted." *Corp. of America v. Kasey* (1960) 176 Cal. App. 2d, 357 [6]. Plaintiff's assertion that his agreement with Mr. Gonzalez constituted an implied contract is supported by *Corp. of America*.

Plaintiff's claims that assault and battery occurred is easier to support. Plaintiff did not instigate the security officers who punched and hit him approx. eight times. Each of the alleged eight hits ground Plaintiff's claim in battery; his injuries support his claim for relief and his claim to officers that the event was assault and battery.

Plaintiff also asserted a claim for slander (*Cal. Civ. Code § 46*), an "orally uttered" untruth whereby the security officer – the largest of the four – lied to the officers when he told them that

Ex. 8

1    Plaintiff had "threatened his kid." Plaintiff believes additional lies were told to the officers by the

2    security officers and justify his request to add additional claims upon which relief will be sought.

3    Libel and Slander are torts involving "the intentional publication of a statement of fact which is false,

4    unprivileged, and has a natural tendency to injure or which causes special damage." *Gilbert v. Sykes*,

5

6    147 Cal.App.4th 13, 16. The damage caused by the security officer's slander led to Plaintiff's "5150"

7    hold.

8       Plaintiff has asserted a claim for sexual harassment for the approx. four occurrences of the

9    officer fondling his genitals. Plaintiff has asserted his claim under California Civil Code § 51.9. The

10    Code defines sexual harassment when plaintiff proves all of the following elements:

11

12        1) There is a…professional relationship between the plaintiff and defendant.

13        2) The defendant has made sexual advances…or engaged in other verbal, visual, or physical

14           conduct of a sexual nature…

15        3) There is an inability by the plaintiff to easily terminate the relationship.

16        4) The plaintiff has suffered or will suffer economic loss or disadvantage or personal injury,

17

18           including but not limited to, emotional distress or the violation of a statutory or

19           constitutional right, as a result of the conduct described in (2).

20    Plaintiff asserts each of the 4 conditions supporting sexual harassment existed within the explanation

21    of the officer's actions – defendant is a professional police officer and was called in a professional

22    capacity where Plaintiff was a party of interest, plaintiff was cuffed and could not escape, defendant

23

24    (officer) fondled Plaintiff's genitals @ four times, and Plaintiff's "inalienable rights" were fractured

25    (*Article I, § 1,* California Constitution) and emotional distress has occurred. Furthermore, if Plaintiff

26    was visibly injured, why wouldn't the officers lend credibility to his claim that he was assaulted?

27

28

Ex. 8

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Plaintiff has considered giving the officer leeway as may be afforded a police officer –he may have been simply thorough in his search for weaponry. Plaintiff has visited several armories since the events herein occurred and asserts that very few guns or advanced weaponry may have been hidden beneath his testicles. A Sig Sauer 9 MM would not fit beneath his appendage. Plaintiff also asserts that his testicles are probably not of judicial importance, but considering the events that have transpired, must discuss the matter. Perhaps we should have the Public Offender's Office begin a public inspection – to be completed at the steps of City Hall. Perhaps Dr. Rouse can inspect Plaintiff's testicles in order to better understand the immense threat Plaintiff's genital region poses to the City and County of San Francisco. Plaintiff, if the reader can't tell via the previous couple of sentences, is not happy with this City's official's behavior thus far.

Plaintiff has alleged a claim for harassment citing Cal. Civ. Code § 1708 against SFGH's staff for injecting him with a needle and for intimidating him (Section II, pg. 7, 8). Plaintiff will rest on statute and the Statement of Facts as they should be sufficient to support Discovery proceedings.

Plaintiff has stated a claim for duress against SFGH's Psychiatric Ward citing Cal. Civ. Code § 1569 which consists in:

1) Unlawful confinement of the person…;

2) Unlawful detention of the property of any such person; or,

3) Confinement of such person. lawful in form, but fraudulently obtained, or fraudulently made unjustly harassing or oppressive. (Enacted 1872.)

Plaintiff contends the handcuffing and transportation to San Francisco General constituted the first count of duress (3). The second was the "5150" 72-hour stay in the Hospital – Plaintiff contends the events whereby Plaintiff was strapped to a bed is to be considered unlawful confinement, as was the "5150" 72-hour hold itself. Why? If Plaintiff was visibly injured and complained of invisible



injuries (to his ribs), wouldn't a reasonable person conclude he was hit? Isn't that a crime? Were the Security Officers injured? If not, what can a reasonable person conclude?

In support of Plaintiff's claim of unlawful action defining duress, *Goldstein v. Enoch* states "Duress and menace arise by virtue of unlawful action…" 57 Cal. Rptr. 19, 248 Cal. App. 2d 891. Even if that statement is in antithesis to Section 3 of the statute for Duress in California, it is nonetheless applicable here.

Plaintiff has asserted a claim for breach of fiduciary duty against the San Francisco Police Dept., San Francisco General Hospital and his attorneys in the Public Defender's office. As his claim relates to all named defendants, Plaintiff insists that "when a fiduciary relationship exists and the defendant abuses the confidence of the plaintiff, both law and equity have a most tender regard for the rights of the complaining party" (*Werkschull v. United California Bank* (1978) 85 Cal.App.3d 981, 1004 [149 Cal.Rptr. 829]. Police officers have a responsibility to investigate truth in matters of disputes. Hospitals have a responsibility to ensure proper care is given and attention paid to an individual's claims. Once Plaintiff asked Ms. Masi not to represent his interests, Ms. Masi should have left immediately and withdrawn completely from the legal process. Her duty was to Plaintiff. The Public Defender Mr. Meyer had a fiduciary obligation to refute the Judge's insistence that he was "fluidly psychotic."

In support, "the essence of a fiduciary…relationship is that the parties do not deal on equal terms, because the person in whom trust and confidence is reposed and who accepts that trust and confidence is in a superior position to exert influence over the dependent party." *Richelle L. v. Roman Catholic Archbishop*, 106 Cal.App.4th 257. 260. Plaintiff contends he was completely dependent on the officers, the Hospital, and his attorneys – they failed in their responsibilities to him. The hospital intimidated him, locked him in a room and injected him with a needle without cause. The Police



1  Officers ignored his injuries and his adamant insistence that he had been assaulted.  A Police Officer

2  harassed him sexually.  The other ignored the events.  The Public defender's office accepted the

3  Judge's insistence that Plaintiff was "psychotic."  The diagnosis is absurd.

4      The last claim – that Mr. Meyer breached his fiduciary role to Plaintiff when he accepted the

5  Judge's insistence that Plaintiff suffers from some sort of psychosis - is rooted in the Diagnostic and

6

7  Statistical Manual of Mental Disorders, Fourth Edition TEXT REVISION (DSM-IV-TR).  Psychotic

8  symptoms include hallucinations, persistent delusions with periods of overlapping mood episodes,

9  disorganized speech, grossly disorganized or catatonic behavior.  These symptoms are discussed in

10  the DSM-IV, pg. 343, Section 298.9.  Plaintiff contends he does not have nor ever had these

11  symptoms.  The fiduciary relationships existence is unquestionable – an attorney and client is a

12

13  recognized legal relationship (see Frankel, *Fiduciary Law* (1983) 71 Cal.L.Rev. 795).  Mr. Meyer

14  needs to be reminded of his oath – officially (Exhibit I).

15      Plaintiff suggests a breach also occurred when Ms. Masi was asked not to represent Plaintiff's

16  interest.  After Plaintiff in essence fired her, Plaintiff witnessed Ms. Masi speaking to the Judge or

17  Doctor in the room where Plaintiff's "trial" was held.  Plaintiff suggests that Ms. Masi was there in

18

19  support of Plaintiff, had an obligation to protect his interests via the attorney/client relationship, was a

20  member of a group solely meant to defend citizens rights (as opposed to the Hospital's), and, in

21  meeting with the Judge or Doctor did commit the breach.  Plaintiff contends Ms. Masi should have

22  left the Hospital immediately and kept herself out of the situation completely.  This is serious.  In

23  support, "[a] fiduciary who commits a breach of 'his' duty as fiduciary is guilty of tortuous conduct

24  to the person for whom 'he' should act…" *Richelle L. v. Roman Catholic Archbishop*, 106

25

26  Cal.App.4th 257, 273.

27

28

Ex. 8

Plaintiff has asserted a claim for harassment against the Office of the District Attorney in San Francisco, CA and cites Cal. Civ. Code § 1708 to support the claim, also supported anecdotally within Section II, pg. 12 herein.  Plaintiff could also add a claim for breach of fiduciary duty against the D.A.'s office for the lack of investigation into Defendant's alleged assault against Plaintiff and sexual harassment claims against the S.F.P.D. as stated within Plaintiff's Statement of Facts.

Plaintiff has made a claim for libel (*Cal. Civ. Code § 45*) against John. D. Rouse of the Hospital's Psychiatry Department.  The claim, made on pg. 3, is rooted in a falsely written statement (Exhibit B, Notice of Certification).   Plaintiff is not a danger to himself and does not suffer from anything relating to alcoholism or a mental disorder as is stated in the first third of the Notice of Certification.

Further, the "facts" as stated in the Notice of Certification are incorrect.  Plaintiff drove here in 4 days, did receive some sleep on the way, but due to homelessness caused by a Dean's poor decision-making skills has suffered from a lack of sleep due to homelessness (i.e. – sleeping on a sidewalk surrounded by the smell of urine).  Plaintiff was and is, however, agitated – his agitation with inept doctors continues and drives the lawsuit herein.  Dr. Rouse's allegations that Plaintiff has delusions of "getting rich via multiple lawsuits" are unfounded.

Dr. Rouse did, however, correctly indicate lawsuits have been filed and should maintain financial restitution as a result – that's the nature of properly pleaded civil suits where financial restitution is sought and damage had been done by defendants to a plaintiff in a claim.

Plaintiff files lawsuits because laws have been broken, because he has been harmed – some of the harm can't be repaired (time taken).   Quality of time, however, can be adjusted.

Also, if Plaintiff is homeless and if Plaintiff formerly had income of @ $170,000 per year – income measured before adjusting for 401(k) deductions - what happened?  Is it possible his legal

Ex. 8

1    allegations – scattered throughout the country – are correct? Has he had appropriate representation?

2    Plaintiff also asserts that Dr. Rouse did not meet with Plaintiff for enough time to deem him disabled

3    or a danger to himself. The allegations should cost Dr. Rouse his medical license. If Dr. Rouse is not

4    an attorney, perhaps he should silence himself re: Plaintiff's other lawsuits not related to him.

5

6          Finally, Plaintiff has asserted that his rights pursuant to the State of California's Constitution

7    (*Article I, § 1,* Inalienable Rights, *California Const.*) have been violated. Marriott International, Inc.,

8    Host Hotels & Resorts, Inc., the San Francisco Police Dept., San Francisco General Hospital, the

9    D.A.'s office, and San Francisco's Public Defender's office all have made it quite impossible for

10   Plaintiff to find any sense of happiness in the State of California thus far. The Statement of Facts

11   (Section II) - in its entirety - supports Plaintiff's claim that his "inalienable rights" to enjoy and

12   pursue...happiness and privacy (paraphrased) have been impeded by Defendants' aggregate actions

13

14   (or inaction) from Sept. 28th, 2013 through Oct. 10th, 2013.

15   ## IV. STATEMENT OF DAMAGES

16        Plaintiff suffered physical injuries which included a split, bleeding, and swelled lower lip and

17   bruised ribs as a result of the assault by Marriott Security officers. The pain from the bruised ribs

18

19   lasted for approximately one week. Plaintiff has suffered emotional distress as a result of this

20   occurrence as well as the occurrence he doesn't recall re: Stone Park, Illinois. He no longer trusts

21   officers.

22        Plaintiff has suffered a damaged local reputation – he has only been here 2 months and

23   doesn't appreciate the greeting so far as stated within the Statement of Facts as well as within the

24

25   U.S. District Court case he filed against Stanford. A rapidly strained relationship with those

26   entrusted with public office in San Francisco has occurred as a result, yet Plaintiff has done *nothing*

27   (emphasis added) wrong.

28

1    Plaintiff suffered a 72-hr incarceration as a result of his claims for breach, assault and sexual

2  harassment leading to the incarceration itself.

3    Plaintiff has suffered emotional harm as a result and does not trust a single local authority in

4  carrying out their responsibilities – abuse of power seems to run rampant.

5
     Plaintiff received "medical treatment" from San Francisco General Hospital (Ex. E) costing
6
7  approximately $13,000. Plaintiff contends the claim for payment may be denied because

8  he is no longer employed, the incident took place outside of Ohio, and, due to indigence, further

9  damage will be done to his creditworthiness.

10
     ## V. REQUEST FOR RELIEF
11
         Plaintiff requests the following compensation and action as a prayer for relief:
12
13     1) Pursuant to Cal. Civ. Code § 3281[6], abandonment/payment of invoice at cost plus late

14         fees, as applicable (Exhibit E, $13,480.49) and,

15     2) Pursuant to Cal. Civ. Code § 3294(a), punitive damages[7] may be awarded by the court as

16         it relates to defamatory claims[8]. Due to the oppressive nature of the entire situation

17         described herein, Plaintiff requests a monetary amount as decided by the Court be
18
19         awarded for all tort damages (assault & battery, sexual harassment, harassment, and

20         defamation claims) and,

21     3) Est. @ $4,500 for a 3 night all-inclusive stay at a full-service hotel (e.g. - The Westin St.

22         Francis, Classic) during Christmas (estimated at $1500 per night in San Francisco,

23         California - inclusive of tax, entertainment, food and beverage, tips, and "rib massage"
24
25         services) to counter the 72-hour hold he endured during his birthday (Sept. 29th) and,

26

27  [6] This particular section of the code covers damages for a person suffering detriment. We need to look up detriment, and once we do, we can recover damages.
28  [7] Awarded if fraud, malice, or oppression has occurred. Plaintiff is suggesting he has been oppressed and dislikes it.
     [8] *Nelson v. Gaunt* (1981), 125 Cal.App.3d 623, 643.

Complaint, *Wright v. Marriott International, Inc., et al*                    Page **18** of **25**


Ex. 8

4) A decorated Christmas tree is to be provided in the hotel room mentioned in #3 above, with gift-wrapped presents including a Starbuck's gift card for $50, a New York Times for each day at the hotel, and Lincoln Logs and,

5) A psychological review is completed by unbiased psychiatrists of the Marriott Security team and both officers involved in the claims herein and,

6) Disciplinary action is taken against Ms. Masi and Mr. Meyer and,

7) Disciplinary action is taken against the 4 Marriott Security Officers and,

8) A review of the security tape from the Marriott and Hospital, if they exist and,

9) Disciplinary action is taken against the police officers and,

10) Disciplinary action is taken against Dr. Rouse and,

11) Disciplinary action is taken against the District Attorney's Investigative Unit and,

12) Plaintiff is permitted a review of all records relating to the incidents herein and,

13) Subject to findings in Prayer for Relief #12, Plaintiff is permitted to adjust claims and relief and,

14) All false statements within Defendants reports are amended and,

15) Letters of apology are written by defendants to Plaintiff for their actions, subject to acceptance by Defendant. The letters are to be signed and notarized and added to the Court's docket and,

16) A report of follow-up reviews and disciplinary actions are documented and shared with Plaintiff by the authorities conducting the review, as permitted by law and,

17) Pro Se attorney's fees and court costs paid by Defendants as it pleases the Court.

## VI. JURISDICTION, VENUE AND TIME LIMITATIONS

Ex. 8

Plaintiff contends that all parties named in the lawsuit (or their representative partners,

divisions or affiliates) herein are centrally located in the City and County of San Francisco, CA.

Pursuant to California Code of Civil Procedure § 85 (by omission[9]), Plaintiff asserts the case

is an unlimited civil case where the total damages claimed is more than $25,000[10].

The Superior Court within San Francisco maintains proper jurisdiction as that jurisdiction

pertains to the Statement of Facts, California state statute pursuant to Codes detailed within, and the

location of the incidents at the time of occurrence. On Sept. 28th, 2013, Plaintiff was a citizen of

Ohio. Plaintiff, on the date of the filing herein, is a citizen of California[11].

Pursuant to Government Code § 945.2, "except as otherwise provided by law, the rules of

practice in civil actions apply to actions brought against public entities." Time limitations pursuant to

California Civil Codes re: civil actions exist as follows:

. Breach of implied or oral contract (2 years as per Cal Civ. Code § 339),

Action against healthcare provider (3 years from injury, 1 year from Discovery as per Cal Civ.

Code §340.5),

Libel, slander, false imprisonment (1 year as per Cal Civ. Code §340(c)) and

Assault and Battery (2 year limitation period pursuant to Cal Civ. Code §335.1).

Gov. Code § 945 expressly gives government entities in the State of California the power to

sue and be sued. Pursuant to the Government Claims Act (Govt Code §820(a) and Govt Code

815.2(a)), the government entity is liable for Plaintiff tort claims by and through (the meaning of

---

[9] An unlimited civil case is any case not a limited one. http://www.courts.ca.gov/1065.htm

[10] Plaintiff suggests the cost of psychiatric reviews requested, invoice waiver, and the stay at the Westin may be over $25,000.

[11] A discussion of subject matter and personal jurisdiction is made here: http://courts.ca.gov/9617.htm, but seems to be missing from Cal. Code – Plaintiff couldn't find the codes for jurisdictional descriptions. Based on Court review of the case herein, a remand to U.S. District, Northern California is possible – based on jurisdiction and citizenship at time of claim.

Ex. 8

1  vicariously) their employees. In this context, the police officers are liable for their alleged tort

2  actions; the City of San Francisco Police Department is also liable, by and through the employee.

3  Statute of Limitations for tort claims against the City of San Francisco and its employees

4  would be six months from the rejection of Plaintiff's claim by the City [Govt C §945.6(a)(1)].

5
6  If the City does not issue a rejection notice, the claim can be filed as a complaint in court

7  within 2 years of the accrual date of the cause of action [Govt C §945.6(a)(1)].

8  For purposes of this lawsuit, Plaintiff suggests proceeding as follows:

9      1) Proceed with case against the security officers' employer (either Marriott International,

10        Inc. or Host Hotels, to be confirmed via Discovery) and S.F.G.H. and

11
12     2) Stay (i.e. – wait, hold) the case against City and County employees and their departments

13        until such time as a claim's response by Plaintiff – needed in order to comply with the

14        Government Claims Act – has been received by Plaintiff. Considering Plaintiff's indigent

15        status and attempts to obtain free legal services for printing and postage from four area

16        service providers to the homeless have been rejected, Plaintiff requests the Court allow

17        communication via e-mail as a substitute for notification to Government entities and their

18        employees. Finally, Plaintiff suggests the initial filing and Summons sent to City and

19        County Dept.'s herein be construed as a claim for relief under the Government Claims

20        Act.

21

22 **VII.   SUMMATION**

23  Plaintiff drove to California on September 14th, 2013 for many reasons. He witnessed what

24  he described as an "end-of-life" decision; an extraordinary emotional response ensued.

25
26  He visited his grandfather, since passed, and witnessed aging. He watched, and felt, Grandpa

27  physically clinging to the lives of his family, his friends.

28

Ex. 8

1   He became fearful of his own emotional response to his grandfather's eventual passing. He

2   was concerned that his grandmother would not endure his death. It was not his place to be there – he

3   was the eldest, but due to proximity and catalogued life events, was estranged from the Ottoville

4   branch.

5

6   Plaintiff confronted his father on a childhood issue and was reminded of something he said to

7   his ex-wife. He was reminded of transference. He shared his anger with Dad – he didn't have a

8   family of his own and he was destitute.

9   A coach heard and told Plaintiff not to waste anymore time.

10   "Don't hesitate again," the coach's look said.

11   He was tired of selling cars.

12

13   A sexual encounter – the first in a couple of years – showed him how much muscle he had

14   lost. Layers of fat replaced the muscle he had worked for 3 years to build. He started to diet and

15   walk hills for an hour at a time.

16   He was reminded of a book's meaning on an iPod shuffle. He picked up the binding and

17   pages within and opened the book. He was reminded he was a 40-year old man living a 23-year old

18   young man's life; a life he had already led and loved.

19

20   Plaintiff's reputation for hard work had been negatively accentuated by misinformation and

21   malicious rumor. He re-read his cases; the appeals were accurate and succinct.

22   He was tired of family dysfunction, of bosses less capable, of potential destroyed, of injustices

23   left unfinished, of extraordinary ego, of repeated racketeering, and of a possible life left unclaimed.

24

25   "Go West young man" was a journal entry he had written years ago. It's what his great-Aunt

26   R. Jean Swartz helped him find, more than 25 years earlier.

27

28

Ex. 8

His drive to California showed him beauty he's never seen before, in a manner he had never experienced.

"*Do you like mountains?*" the terrain asked.

The car that brought him, although not his any longer, showed the strength and resolve of an industry:

"*7,300 miles and no oil change? No problem, but maybe stop in earlier next time.*"

He went to a café in Marin County, his first stop. She was not there. He went to a Law School – not there.

He was forced to the streets of San Francisco and found them a bit difficult. He spent 9 days running from rats hiding in the parks.

He was reminded he can take a punch, but might need to work on throwing a few.

And when he asked for help from those whose very specific job it is to investigate, they ignored him.

Plaintiff wonders, do defendants understand the difference between seeking a job to obtain Power and needing Power in order to do a job?

## VIII. INDEX OF EXHIBITS

| Exhibit Name | Relevance, Description |
|---|---|
| Exhibit A – Letter to Hospital CEO | Demanded hearing, included statement indicating he was assaulted. Supports malicious intent by Hospital. |
| Exhibit B – Notice of | Proof of Defamation claims. |

Complaint, *Wright v. Marriott International, Inc., et al*                    Page **23** of **25**

Ex. 8

| Certification | |
|---|---|
| Exhibit C – Journal Entries | Indicates timeframe of events as stated in Complaint's body, state of mind. |
| Exhibit D – Business Cards | Supports claims that "in-person" meetings occurred. |
| Exhibit E – Invoice/Insurance Claim from SFGH Medical Center | Supports potential allegation of fraud, supports current claim for relief. |
| Exhibit F – Email threads | To/from Mr. Guzman as part of the District Attorney's office and to/from City and County officials for notice of claim and impending suit as courtesy. |
| Exhibit G – Memorandum "Homelessness in San Francisco, A View from Within" | To be completed and added to docket in a future filing. |
| Exhibit H – Memorandum from Summit County Filing | Related filing – same exercise, different location. Indicates process to be followed to disprove Dr. Rouse; indicates financial harm incurred over the years. |



Ex, 8

| Exhibit I – Attorney Oath, State of California | Oath, Business and Professions Code § 6068 |
|---|---|
| Exhibit J – Credit Report | Indicates potential level of Financial Responsibility |
| Exhibit K – Release Document | SFGH Document |

